UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| SUSAN SHORTILL, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 2:25-cv-00264-JAW |
| | ) | |
| RELIANCE STANDARD | ) | |
| LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTIONS
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiff alleges that Defendant violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq., by denying Plaintiff long-term disability benefits. Each party has filed a motion for judgment on the administrative record. (Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 16; Defendant's Motion for Judgment on the Record for Judicial Review, ECF No. 17.)

Following a review of the administrative record and after consideration of the parties' arguments, I recommend the Court deny Plaintiff's motion and grant Defendant's motion.

**BACKGROUND**

**I.      Plaintiff's Employment and the Long-Term Disability Policy**

Plaintiff started working as a claims supervisor for TRISTAR in 2021. (Administrative Record (AR), AR0289, AR0301, ECF No. 8; Compl. ¶ 9, ECF No. 1; Answer ¶ 9, ECF No. 4.)  TRISTAR classified Plaintiff's supervisor position as sedentary,

meaning that the job involved sitting most of the time but could require "[e]xerting up to 10 pounds of force occasionally" and "a negligible amount of force frequently or constantly to lift, carry, push, pull, or otherwise move objects." (AR0304.)   The required physical activity included frequent reaching (extending hands and arms in any direction), occasional pushing (using upper extremities to press against something with steady force in order to thrust forward, downward, or outward), and occasional pulling (using upper extremities to extend force in order to drag, haul, or tug objects in a sustained motion).  (AR0305.)

As a TRISTAR employee, Plaintiff was insured under a long-term disability plan (Plan), which was funded through a group insurance policy (Policy) provided by Defendant.  (Compl. ¶¶ 1–2; Answer ¶¶ 1–2; AR0255.)   Under the Policy, Defendant agreed to provide monthly income replacement benefits to an eligible insured TRISTAR employee for "Total Disability" resulting from a covered injury subject to the terms of the Policy. (AR0001.)  TRISTAR's full-time employees—those working in permanent positions at least 30 hours per week—were eligible for insurance under the Policy. (AR0007, AR0009, AR0020.)

The Policy provided that Defendant would pay a monthly benefit if an insured (1) "is Totally Disabled" as the result of a covered injury; (2) is under the regular care of a physician; (3) has completed the 180-day elimination period; and (4) "submits satisfactory proof of Total Disability to us."  (AR0022.)[1]  In pertinent part, the Policy defined "Totally

---

[1] The Policy defined "Injury" as a bodily injury "resulting directly from an accident" which must cause "Total Disability which begins while insurance coverage is in effect for the Insured."  (AR0009.)  The Elimination Period in the Policy is defined as "180 consecutive days of Total Disability" beginning on the first day of Total Disability, during which period no benefit is payable.  (AR0007, AR0009.)

Disabled" and "Total Disability" to mean that, as a result of a covered injury, during the elimination period and for the first 24 months for which a monthly benefit is payable, "an Insured cannot perform the material duties of his/her Regular Occupation[.]" (AR0010.)[2] The Policy defined "Regular Occupation" to mean "the occupation the [insured] is routinely performing when Total Disability begins" and explained that the duties of an occupation would be evaluated with reference to the insured's "occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale." (AR0009.) The Policy provided for termination of the monthly benefit in certain instances, including upon "the date the Insured ceases to be Totally Disabled." (AR0023.)[3]

The Policy also provided for termination of an insured's coverage in certain instances, including on the last day of the policy month in which the insured ceased to meet the eligibility requirements of the Policy – i.e., ceased to work for TRISTAR on a full-time basis. (AR0020.) A person whose coverage was terminated could be reinstated if that person returned to work on a full-time basis in a permanent position for at least one full day. (*Id.*)

---

[2] The Policy provided that an insured who was Partially Disabled (i.e., able to perform the material duties of his/her Regular Occupation on a part-time basis, or some of the material duties on a full-time basis) would be considered Totally Disabled except during the Elimination Period. (AR0010.) The Policy did not define "material duties." As Plaintiff acknowledges, other aspects of the definition of Total Disability under the Policy are not relevant here. (*See* Plaintiff's App'x of Facts ¶ 9, ECF No. 16-1.)

[3] Under the Policy, if an insured returned to work for less than six months after a period of Total Disability for which benefits were payable, "a recurrent Total Disability for the same or related cause [would] be part of the same Total Disability" without the need to complete a new Elimination Period, and Defendant's "liability for the entire period [would] be subject to the terms of [the] Policy for the original period of Total Disability." (AR0023.)

3

To make a claim, an insured was required to submit to Defendant a notice of a claim and written proof of loss identifying the date the insured's Total Disability began, the cause of Total Disability "as determined by objective medical evidence, diagnostic studies, and examinations acceptable to the medical community" and the extent of the insured's Total Disability, including all restrictions and limitations.  (AR0015.)  An insured also had to "send proof of . . . continuing eligibility to receive disability benefits under the Policy[.]" (*Id.*)

Under the Policy, Defendant served as the "claims review fiduciary" and had "discretionary authority to interpret the Policy . . . and to determine eligibility for benefits" thereunder.  (AR0016.)

## II.    Plaintiff's Medical History and Application for Benefits

In March 2024, Plaintiff applied for long-term disability benefits under the Policy. (AR0038, AR0267–0289.)   In her application, Plaintiff reported that she suffered a traumatic injury at home on July 28, 2023, when she fell backward down a flight of stairs and landed on a concrete floor.  (AR0267.)  Plaintiff asserted that the fall caused a broken neck, right and left shoulder pain, back pain, bruising, and a concussion.  (*Id.*)  She stated that she could not work because she was "unable to use [her] right arm" and had "severe pain due to trauma in [her] neck."  (*Id.*)

According to medical records submitted by Plaintiff, while in the emergency department of a local hospital on the night of her fall, Plaintiff was placed in an Aspen cervical collar for "a nondisplaced fracture of the C7 spinous process," and she was referred to an orthopedist, James D. Kang, MD.  (AR0322.)  On August 1, 2023, Dr. Kang opined,

4

based on examination, X-rays, and a CT scan, that the cervical spine injury was "stable" and "benign" and would heal on its own in about six weeks. (AR0326.) During a follow-up visit the next month, Dr. Kang noted that Plaintiff's most recent MRI showed some "bulging" of discs at C5-6 and C6-7, but he continued to recommend a conservative course of treatment, observing that "there may be a greater than 50 to 70% chance that this will go on to heal over the next month or so." (AR0321.)

On October 10, 2023, Dr. Kang noted that X-rays showed that the C7 spinous process remained stable, and that Plaintiff's C7 spinous fracture was "spontaneously healing[.]" (AR0319.) Dr. Kang's notes also reflect that Plaintiff had recently postponed surgery on her right rotator cuff due to an unrelated infection, and that he planned to refer her to physical therapy for her cervical spine after the rotator cuff surgery so that she could rehabilitate her cervical spine and shoulder at the same time. (AR0316, AR0319.)

Plaintiff then saw another orthopedist, Gavin Webb, MD, for "severe right shoulder pain due to traumatic fall."[4] (AR0339.) On October 18, 2023, Plaintiff underwent arthroscopic surgery on her right shoulder to repair the "complete tear of [her] rotator cuff." (AR0343, AR0376, AR0499–0502.)

Approximately two weeks later, Plaintiff visited the orthopedics practice because of left shoulder pain, which began after the July fall down the stairs and might have been exacerbated by the fact that, post-surgery on her right shoulder, she relied solely on her left

---

[4] According to a progress note from the orthopedics office, Plaintiff had suffered from right shoulder pain caused by tendonitis since January 2023, months before the fall down the stairs, and had received a steroid injection in March 2023 that relieved her symptoms. (AR0375, AR0412.)

5

arm.  (AR0376, AR0478.)  An MRI showed no significant rotator cuff tear in her left shoulder; Plaintiff was given a steroid injection in the left shoulder, which injection provided 95% relief.  (AR0376, AR0471.)

Plaintiff attended physical therapy to rehabilitate her right shoulder through the remainder of 2023. (AR0435–0441, AR0446–0458, AR0463–0464, AR0467–0468, AR0472–0475, AR0482–0483, AR0490–0496.)  Her right shoulder rehabilitation work continued into April 2024. (AR0364–0374, AR0379–0384, AR0394–0410, AR0419–0420, AR0433–0434.)

In support of her application for long-term disability benefits, Plaintiff submitted several Physician Statements completed by Dr. Webb, who originally opined—prior to the rotator cuff surgery—that Plaintiff would be limited for six to eight weeks following surgery by the complete immobilization of her right arm during that period.  (AR0339-0342.)  He later amended his assessment, concluding that Plaintiff was continuously disabled from doing regular work through February 10, 2024.  (AR0342.)

In the meantime, in January 2024, Plaintiff followed up with Dr. Kang on the advice of her physical therapist after she reported increased pain her right shoulder. (AR0315, AR0808.)  Dr. Kang reported that her physical exam was benign, and that X-rays showed that her C7 spinous fracture was "completely filled in with bone" and "solidly healed." (AR0315.)  He reassured her that "there was nothing ongoing in her cervical spine" and that her shoulder issues were "probably truly" intrinsic to her shoulder and unrelated to her neck.  (*Id.*)

6

Plaintiff received a steroid injection in her right shoulder in January 2024, which injection helped to improve her range of motion. (AR0375, AR0415–0417.) She also had a post-operative MRI of the right shoulder. The MRI revealed that the rotator cuff appeared to be intact, although there was "a possible tiny full-thickness perforation" of the junctional fibers of the rotator cuff, the bicep tendon appeared to be intact, and there was a thickening of the joint capsule "consistent with adhesive capsulitis." (AR0358.)

Plaintiff also saw her primary care physician, Pamela R. Schultze, MD, for an annual physical exam in January 2024. (AR0424.) According to the notes from the visit, Plaintiff reported experiencing fatigue following a COVID infection in December 2023. (AR0424-0425.) Dr. Schultze determined that post-viral fatigue syndrome was likely the cause of Plaintiff's fatigue. (AR0426.) Dr. Schultze's notes also reflect that Plaintiff was suffering from depression with anxiety. During that exam, Dr. Schultze modified the dosage of Plaintiff's antidepressant medications. (AR0424, AR0426.)

In February 2024, Kelly L. Collins, PA-C, released Plaintiff to work as of February 29, 2024, with limitations to six-hour shifts for two weeks, followed by resumption of a regular schedule and with no lifting, pushing, or pulling more than five pounds for eight weeks. (AR0345.) Plaintiff received short-term disability benefits from August 2023 through late January 2024; she returned to work on a part-time basis for a few weeks in February and March 2024, and then on a full-time basis for two days, on March 14 and 15, 2024. (AR0287–0288.) After her shift on March 15, 2024, Plaintiff's position with TRISTAR was terminated as part of a layoff. (AR0157, AR0296.)

In the meantime, at a March 7, 2024, visit to the orthopedics practice regarding Plaintiff's right shoulder, PA Collins advised Plaintiff to continue physical therapy and to "[c]ontinue with work restrictions." (AR0375.) During the visit, Plaintiff reported that physical therapy had been "extremely beneficial," that her pain was a three out of ten, and that she had "some discomfort with reaching and repetitive motions" but had no other concerns. (AR0376.)

As part of her application for long-term disability benefits, Plaintiff provided a physician's statement dated March 7, 2024, completed by PA Collins. (AR0343–0344.) PA Collins wrote that in an eight-hour day, Plaintiff was able to occasionally lift or carry small objects of less than five pounds, could not use her right upper extremity for repetitive pushing and pulling, and could only occasionally reach above her shoulder. (AR0344.)[5]

During an April 10, 2024, office visit, Dr. Schultze documented that Plaintiff had been experiencing fatigue for eight or nine months "that seemed to be exacerbated by her traumatic fall with multiple surgeries" and that she was suffering from a moderate episode of recurrent major depressive disorder that was uncontrolled and likely contributing to her fatigue. (AR1151–1152.) Dr. Schultze increased the dosage of one of Plaintiff's antidepressants and again referred her to a therapist, noting that she "never followed through with that [after] her last visit through the VA." (AR1152.) Dr. Schultze also

---

[5] PA Collins also completed Section F of the form, which the provider is to complete "if limitations are mental/nervous in nature." (AR0344.) PA Collins checked that Plaintiff was "not limited" in her ability to relate to other people, complete and follow instructions, perform simple and repetitive tasks, and perform complex and varied tasks. (*Id.*)

assessed Plaintiff with lateral epicondylitis of her left elbow based on her reports of elbow pain, and she referred Plaintiff to occupational therapy.  (*Id.*)

On April 19, 2024, Plaintiff was seen by PA Collins at the orthopedics practice: PA Collins noted that physical therapy on Plaintiff's right shoulder was "going very well," her range of motion was "good," and her pain rated a "2/10."  (AR0356-0357.)  PA Collins cleared Plaintiff for lifting and strengthening with physical therapy but advised her to "avoid heavy repetitive lifting if returning to work." (AR0355-0357.)  Plaintiff reported that she was "doing most of the things she would like to do" and was "planning on returning to swimming" that summer.  (AR0357.)

On May 7, 2024, Janet Bohnsack, RN, completed a medical review of Plaintiff's file at Defendant's request, which review involved an assessment of the medical records Plaintiff submitted for the period of August 1, 2023 to April 19, 2024.  (AR0063–0065.) Nurse Bohnsack concluded that "there is support for lack of work function from date of loss 7/29/2024 to 4/19/2024 for Claimant who took a fall down the stairs backwards on 7/29/2023[.]"[6]  (AR0065.)  Nurse Bohnsack wrote:

> On 4/10/2024, Claimant was seen by her primary for a follow up visit. Claimant reported some fatigue, some marriage difficulties. Claimant was assessed as having uncontrolled major depression likely contributing to fatigue which was getting worse. Some sadness.  No thoughts to harm herself. Lack of motivation. A therapy referral was made.  Increase bupropion XL.  Claimant was also assessed as having lateral epicondylitis of left elbow.  Referred to occupational therapy.  On 4/19/2024, Claimant was five months status post right shoulder arthroscopy with debridement and arthroscopic rotator cuff repair on 10/18/203. Claimant has completed

---

[6] I assume that the first reference to "7/29/2024" is a typographical error and the date of loss date range should be "7/29/2023 to 4/19/2024."

physical therapy. Claimant also had a 2.5 month post-surgery intra-articular cortisone injection. Claimant has made good progress with range of motion and strength. Claimant was advised to avoid heavy repetitive lifting when returning to work. Based on physical therapy reports and reports from her treating provider, along with her job description Claimant is capable of sedentary work function and her job is sedentary with requirement of lifting up to 10 pounds in an office setting. Claimant does have some underlying depression and was advised on her 4/10/2024 visit to see a therapist and her medication was increased. If this is what is keeping this Claimant from returning to work due to fatigue and lack of motivation, that aspect should be referred to BH [behavioral health].

(*Id.*) On May 15, 2024, Nurse Bohnsack added the following note: "Based on team discussion today at CDM it was determined that as of 4/19/2024 [employee] has sedentary work [function]. If [employee] needs to remain off work for a BH issue we will need records from a BH provider[.]" (*Id.*)

Defendant asked a vocational rehabilitation specialist, Shelly Icardi, to review Plaintiff's "occupation and current physical restrictions to determine if she is precluded from performing her Regular Occupation." (AR0074.) On May 13, 2024, Ms. Icardi wrote that Plaintiff's Regular Occupation appeared to align with the occupation of claims supervisor, as defined by the Department of Labor in the Dictionary of Occupational Titles. (AR0073.) Ms. Icardi observed that Plaintiff's supervisor role "is a Sedentary exertion occupation" and that the physical demands of the occupation involved mostly sitting, talking, and hearing, but occasionally involved lifting, carrying, and pushing or pulling up to ten pounds, walking for brief periods of time, and occasional reaching, handling, and fingering. (AR0074, AR0505.) Referencing Nurse Bohnsack's medical review, Ms. Icardi concluded: "The restrictions and limitations noted above are in alignment with [Plaintiff]'s Own Occupation as a Supervisor of Claims, as performed in the national economy.

10

Therefore, the restrictions and limitations do not preclude [Plaintiff] from performing the material duties of her Own Occupation." (AR0074.)

On June 5, 2024, Defendant informed Plaintiff that, based on the information received, she met the Policy's "definition of Total Disability from July 29, 2023 to April 19, 2024." (AR0246.) Defendant explained that the "[c]urrent medical records only support disability through April 19, 2024," and there were "no medical records supporting you being disabled from your own occupation after that date." (*Id.*) Defendant determined that because Plaintiff "no longer" was "considered disabled from [her] own occupation as of April 19, 2024," she no longer met the definition of Total Disability under the Policy. (AR0246–0247.)

## III.  Plaintiff's Appeal

Plaintiff appealed from Defendant's decision. (AR0202.) She also submitted additional records of her continuing medical treatment. (AR0585–0648, AR0653-0676.) The records reveal that Plaintiff attended occupational therapy in May 2024 for left elbow pain and reported that she "benefit[ted]" from it. (AR0657–0662, AR00665–0672.) At her first occupational therapy visit on May 8, 2024, Plaintiff reported a two-to-four-week history of pain in her left elbow that had "worsened" and was "affecting her functioning." (AR0668.) The occupational therapist noted that Plaintiff reported difficulties with "holding phone in hand, sleeping posture, dressing, cutting, cooking, [and] lifting."

11

(AR0670.)  The following week, Plaintiff reported that she had recently gardened for two days with her mother, and that activity had aggravated her left elbow.  (AR0659.)

On June 11, 2024, Plaintiff saw Dr. Kang at the orthopedic spine clinic "presenting with 1 month history of neck pain and headaches."  (AR0644)  Plaintiff reported "that [the pain] began suddenly last month."  (*Id.*)  Dr. Kang noted that Plaintiff had been "doing well but about 2 to 3 months ago she started developing progressive worsening neck pain with bilateral pain into her arms and numbness and tingling into her hands" which had progressed to the point where she was "getting headaches and having a lot of functional difficulties."  (AR0647.)  For example, Plaintiff reported that "it can be hard to hold a coffee mug."  (AR0644.)  Dr. Kang found that the fracture caused by the fall "was completely healed" so he did "not think this is the problem" and concluded that Plaintiff's "disc herniation at C6-7 is what is starting to cause her trouble at this point."  (AR0647.)  Because a past MRI had shown spondylosis and disc herniation in the C6-7 area, the clinic ordered a new MRI "to evaluate for worsening disc bulging/herniation, which may be causing her symptoms."  (*Id.*)

According to Dr. Kang, the updated MRI demonstrated that the disc "protrusion had enlarged somewhat and there was now some degree of progressive cervical stenosis causing a level of cord compression."  (AR0619.)  Plaintiff was diagnosed with cervical stenosis with a herniated disc (C6-7) and bilateral cervical radiculopathy.  (*Id.*)

Dr. Kang performed an "[a]nterior cervical microdiscectomy and fusion [C6-7] with harvesting of left anterior iliac crest bone graft" on June 26, 2024.  (*Id.*)  Thereafter,

Plaintiff engaged in physical therapy through August 2024 to rehabilitate her neck. (AR0585, AR0908–0919.)

In September, Nurse Bohnsack reviewed Plaintiff's medical records from June and July 2024 to evaluate whether the records supported reopening Plaintiff's claim. (AR0066.)  After reviewing those records, Nurse Bohnsack concluded:

> Based on updated clinical records received, there is support for reopening this claim for Claimant who took a fall down the stairs backwards on 7/29/2023 and sustained a C7 clay shoveler's fracture that was treated conservatively and eventually healed on its own, but on 6/11/2024, Claimant was seen for a new [complaint] of a one month history of sudden neck pain and headaches.

(*Id.*)  In response to the claims examiner's question as to the additional time Plaintiff's restrictions prevented her return to work, Nurse Bohnsack found that the medical records supported "from 6/11/2024 to 9/11/2024," which reflects "three months for surgery and recovery."  (*Id.*)  The claims examiner told Plaintiff that he would recommend to Defendant's management that her case be reopened.  (AR0208.)

After a review of the recommendation, a note was entered in the claim file acknowledging that the claim had previously been approved "to 4/19/2024 only as medical documentation did not support an ongoing disability beyond 4/19," and raising a "concern" regarding Plaintiff's eligibility for coverage after April 19, 2024.  (AR0213.)  The note includes in pertinent part the following:

> [W]hat was [Plaintiff's] disability and/or work status from 4/19/2024 to 6/11/2024?  Was [Plaintiff] working during this timeframe?  If so, at full duty?  If not working, and not treating during this timeframe whatsoever,

13

> [Plaintiff] was not on an approved leave/no approved disability claim and would not be eligible for benefits to pick up as of 6/11.

(*Id.*)  Defendant directed the claims examiner to "clarify work status from 4/19 to 6/11."

(*Id.*)  Defendant, through the claims examiner, then questioned Plaintiff about the period from April 19, 2024 to June 11, 2024.  Plaintiff confirmed that she was laid off by TRISTAR on March 15, 2024, and had not worked anywhere since; she stated that she had provided all medical records for the April-to-June period.  (AR0215.)

On October 24, 2024, Nurse Bohnsack conducted a further review of medical records of Plaintiff's treatment in April, May, and October of 2024 to determine whether the records supported disability from April to May 2024.  (AR0068.)  She concluded:

> Based on updated clinical records received, there is no support for a lack of work function from April-May 2024 for Claimant who took a fall down the stairs backwards on 7/29/2023 and sustained a C7 clay shoveler's fracture that was treated conservatively and eventually healed on its own.  During the time period in question, Claimant was seen for a variety of reasons including . . . reports of fatigue that seem to be related to her depressive disorder and her medications were adjusted.  Claimant was also referred to BH therapy. Claimant was referred to physical therapy during this time for reports of lateral epicondylitis of left elbow but did report on several occasions to both her provider and occupational therapy that she was able to do planting over two days in her yard with her mother.  Labs were done during this time that were basically normal.  It appears Claimant has work function at this time, though she did report she was laid off at work. Claimant was also seen for follow up of her 5 months status post right shoulder arthroscopy with debridement SLAP tear.  Claimant continued with physical therapy and home exercises.  Claimant was reported as making good progress with range of motion and strength.  Ok for progressive lifting with physical therapy and at home.  Avoid heavy repetitive lifting if returning to work.

(*Id.*)  On November 1, 2024, the following note was placed in Plaintiff's file: "Based on a CDM discussion that took place this morning the medical received does not impact this

14

claim and for the time period of April-May 2024 [Plaintiff] was capable of sedentary work function." (AR0069.)

On November 6, 2024, Plaintiff explained to Defendant's disability appeals analyst that the July fall had caused the injuries to her neck and her right and left shoulders, that she had to let her neck heal before the doctors could do any shoulder surgeries, and that then "repairing one is almost at the detriment of the other issue." (AR0081.) The analyst informed Plaintiff that Defendant had requested an independent physician review of Plaintiff's medical records, as well as a further vocational review. (AR0081-0082.)

On November 18, 2024, Ashish Anand, MD (board certified in orthopedic surgery), submitted his report of his review of Plaintiff's medical file, which included records from August 1, 2023, through October 22, 2024. (AR0725–0730.) Dr. Anand determined that, due to her neck and shoulder issues, Plaintiff "definitely needed workplace restrictions" and that she had "medically necessary restrictions and/or limitations from 4/19/2024, and ongoing." (AR0727.) Dr. Anand found that Plaintiff could not lift heavy objects or lift objects above shoulder level and could not do any pushing or pulling with her right arm but could use her left arm to push or pull continuously. (*Id.*) He believed Plaintiff was able to continuously sit, stand, and walk, and could continuously use her right and left arms for simple grasping, reaching at waist/desk level and above mid-chest level, fine manipulation, keyboarding, and feeling/tactile sensation. (AR0727–0728.)

Dr. Anand reported that, despite Plaintiff's persistent shoulder issues, Plaintiff "was capable of doing a sedentary job from 04/19/2024 and ongoing with [the] exception [of] having no work capacity for three to six months following surgery in 06/2024." (AR0727.)

15

He explained that "[s]he was quite capable of working with restrictions and limitations from 04/19/2024, and ongoing.  Her pain level was 2/10 and she had decent range of motion.  She was capable of doing Sedentary level work."  (AR0728.)

On November 20, 2024, Defendant received another vocational assessment from Ms. Icardi.  (AR0076, AR0741–0743.)  She noted that a claims supervisor position was a sedentary exertion occupation, and the physical demands of the occupation included lifting, carrying, pushing, and pulling ten pounds occasionally.  (AR0742.)  Ms. Icardi determined:

> The restrictions and limitations recommended by [Dr.] Anand align with the physical demands of [Plaintiff's] occupation of Supervisor, Claims, as performed in the national economy. This occupation does not typically involve pushing or pulling activities.

> Therefore, based upon the recommended restrictions, [Plaintiff] would not be precluded from the ability to perform the material duties of her Regular Occupation.

(AR0743.)

After receiving the additional vocational opinion and Dr. Anand's independent physician review, Defendant informed Plaintiff that "the decision to deny benefits as of April 19, 2024, was correct."  (AR0257.)  Defendant shared the reports with Plaintiff and established a deadline for her "to provide any response, including any additional medical information[.]"  (*Id.*)  Plaintiff submitted additional medical reports showing that she had surgery to re-repair her right rotator cuff and release carpal tunnel in her right wrist in December of 2024 and resumed physical therapy through early March 2025. (AR0761–780, AR0812–0849.)

16

On March 7, 2025, ruling on Plaintiff's appeal, Defendant summarized its review of the record and concluded that "the original decision to terminate benefits was correct under the terms and conditions of the Policy."  (AR0258.)  Defendant found insufficient evidence to support a finding that Plaintiff had functional impairment requiring restrictions and limitations that would preclude her from performing sedentary activities from April 19, 2024, through June 10, 2024.  (AR0260-0262.)

Defendant also cited the Policy language regarding the eligibility requirements, which provide that a terminated employee may have their insurance reinstated if he or she returns for one full day to "Active Work," which means "actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed."  (AR0261.)

Defendant wrote:

> Based on our complete review of [Plaintiff's] claim, while there was support of restrictions and limitations beginning April 19, 2024, due to her shoulder pain with rotator cuff tear, the restrictions and limitations did not preclude her [from] performing the material duties of her Regular Occupation from April 19, 2024, through June 10, 2024.  In addition, [Plaintiff] did not return to work as of April 19, 2024.

(*Id.*)  Defendant thus upheld its earlier decision to terminate Plaintiff's long-term disability benefits as of April 19, 2024.  (AR0262.)  Having exhausted her administrative remedies with Defendant, Plaintiff filed her complaint in this Court.

17

**LEGAL STANDARD**

## I.        Standard of Review

Under ERISA, a plan participant or beneficiary may sue "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[T]he district court sits more as an appellate tribunal than as a trial court" when reviewing a challenged denial of benefits. *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002). Accordingly, the court's review is ordinarily based only on the administrative record. *Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006).

The standard of review applied to an ERISA benefits claim brought under 29 U.S.C. § 1132(a)(1)(B) depends on the discretion afforded the administrator of the plan. *Campbell v. BankBoston, N.A.*, 327 F.3d 1, 5 (1st Cir. 2003). When, as here, the plan "grants the administrator 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' [the court] review[s] only to ensure that the administrator's decision is not 'arbitrary or capricious.'" *Id.* (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "For purposes of reviewing benefit determinations by an ERISA plan administrator, the arbitrary and capricious standard is functionally equivalent to the abuse of discretion standard." *Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan*, 402 F.3d 67, 74 n.3 (1st Cir. 2005).

"Under the 'arbitrary and capricious' framework, as applied to ERISA review, a decision will be upheld 'if it is reasoned and supported by substantial evidence.'" *Buffonge*

18

*v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 27 (1st Cir. 2005) (quoting *Gannon v. Metro. Life Ins. Co.,* 360 F.3d 211, 213 (1st Cir. 2004)).  "The standard is generous—the decision must be upheld if there is any reasonable basis for it—but it is not a rubber stamp." *Wallace v. Johnson & Johnson*, 585 F.3d 11, 15 (1st Cir. 2009) (quotation marks and citations omitted).  The "analysis focuses on whether the record as a whole supports a finding that the plan administrator's decision was plausible[.]" *O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016) (citation and quotation marks omitted).  In this context, substantial evidence means evidence "reasonably sufficient to support a conclusion." *Vlass v. Raytheon Emps. Disability Tr.*, 244 F.3d 27, 30 (1st Cir. 2001).  "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Wright*, 402 F.3d at 74.

## II.     Structural Conflict

Plaintiff asserts that Defendant operated under a structural financial conflict of interest "in which it decided the merits of the claims for which it was liable." (Plaintiff's Motion, at 4.)  The standard of review, however, is not changed by the fact that Defendant would have to pay Plaintiff's claim from its own assets. *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 125–26 (1st Cir. 2004).  Instead, a reviewing court must weigh structural conflict "as a factor in determining whether there is an abuse of discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (quotation marks omitted).  In this multi-factored analysis, Plaintiff "bears the burden of showing that the conflict influenced the Plan administrator's decision in some way." *Troiano v. Aetna Life Ins. Co.*, 844 F.3d 35, 45 (1st Cir. 2016).

19

Here, where the record reflects that Defendant took steps to insulate the claims determination process from its financial interests by, for example, employing third party peer reviewers and an independent appeal unit, (AR0256), and where Plaintiff has not cited any evidence to suggest that the structural conflict influenced Defendant's decision in some way, the conflict is entitled to little, if any, weight in the overall analysis. *See Bernitz v. Usable Life*, 149 F.4th 113, 122-23 (1st Cir. 2025) (affording little weight to structural conflict where administrator employed third-party vendors to select independent physicians to analyze claimant's medical records, and where record did not reflect administrator had a history of biased claims administration).

## DISCUSSION

### I.   Consideration of Plaintiff's Mental Health

Plaintiff contends that Defendant failed to provide the "full and fair review" required by 29 U.S.C. § 1133(2) and implementing regulations promulgated by the Secretary of Labor. Plaintiff points to 29 C.F.R. § 2560.503-1(h)(2)(iv), which requires "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." *Id.* In this vein, Plaintiff argues that "Defendant never considered the impact of Plaintiff's well-documented deteriorating mental health" on her functional capacity and failed to refer her claim for a behavioral health review. (Plaintiff's Motion at 10, 19-20.)

Contrary to Plaintiff's contention, the record reflects that Defendant considered Plaintiff's mental health condition. Defendant's review at the pre-appeal level, and at the

20

appeal level, included consideration of the April 10, 2024, office note from Dr. Schultze documenting Plaintiff's depression. (*See* AR0068, AR0726.) At the pre-appeal level, when evaluating whether the medical evidence supported the reopening of Plaintiff's claim, Nurse Bohnsack noted that Plaintiff had reported fatigue to Dr. Schultze, who believed that the fatigue seemed to be related to Plaintiff's depression: Plaintiff was referred to therapy, and her antidepressant medication was adjusted. (AR0068.) At the appeal level, in the course of his peer review, Dr. Anand noted that Plaintiff had depression and had been advised to consult with a psychiatrist. (AR0729.)

Further, Plaintiff did not include her mental health condition among the bases for her disability. "A claimant seeking disability benefits bears the burden of providing evidence that [she] is disabled within the plan's definition." *Morales-Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 700 (1st Cir. 2007). Consistent with this principle, the Policy provided that Plaintiff had the burden of proving disability. (AR0022.) On Plaintiff's application for benefits, Plaintiff did not assert that a mental health condition prevented her from working; rather, she alleged disabling symptoms including a broken neck and right and left shoulder pain caused by a traumatic fall that occurred on July 28, 2023. (AR0267.) The claims examiner also noted that Plaintiff did not mention any psychological concerns during his phone calls with her. (AR0192.) While some records document Plaintiff's depression, Plaintiff did not offer any evidence that she pursued treatment for depression with a therapist or other mental health provider during the relevant period.

In sum, Defendant considered Plaintiff's mental health condition in its assessment of Plaintiff's claim, and there are no records or opinions that suggest that Plaintiff's mental

21

health condition precluded her from working as a claims supervisor.

## II.      Consideration of Plaintiff's Physical Condition

Plaintiff argues that Defendant's decision to terminate benefits was arbitrary and capricious because Defendant (1) "engaged in a siloed analysis of multiple conditions caused by the same traumatic injury to exclude the impact of 2/3 of Plaintiff's injuries" and (2) unreasonably directed its peer reviewer, Dr. Anand, to "focus solely" on the period between April 19, 2024, and June 11, 2024.  (Plaintiff's Motion at 3, 18, 24.)  She contends that Defendant's focus on PA Collins's treatment notes is "largely misguided" as PA Collins only treated Plaintiff's right shoulder, and that a review of the record as a whole leads to one conclusion: that although Plaintiff had recovered somewhat from her first shoulder surgery as of April 19, 2024, she remained totally disabled "as a result of the combined effects of all the injuries she suffered from her fall."  (Plaintiff's Opposition to Defendant's Motion at 2-4, ECF No. 18.)  Plaintiff further submits that Dr. Anand's review supported a determination of Total Disability within the meaning of the Policy because he concluded that Plaintiff could not push or pull with her right arm, which activity was required by her Regular Occupation.  (Plaintiff's Motion at 26.)

Defendant contends that the evidence—including the medical records and opinions of Plaintiff's treatment provider (PA Collins) and the opinions of two experts after review of the record—supports Defendant's determination that Plaintiff was no longer totally disabled as of April 19, 2024.  (Defendant's Opposition to Plaintiff's Motion at 8-9, ECF No. 19.)  Defendant further argues that Plaintiff did not present any evidence to contradict the expert opinions, even though she was given the opportunity to do so.  (*Id.* at 9-10.)  As

22

to the focus on the period of time from April 19, 2024, to June 11, 2024, Defendant argues that because Plaintiff's eligibility for new (or recurrent) disability benefits ceased at the end of March 2024, following the termination of her position at TRISTAR, Defendant needed to assess whether Plaintiff's disability was continuous from April 19, 2024 until June 11, 2024.  (*Id.* at 12.)

An assessment of the record reveals that Defendant's review of her claim properly accounted for the combined effects of her physical conditions and appropriately evaluated whether Plaintiff was Totally Disabled within the meaning of the Policy as of April 19, 2024.  Defendant considered the injuries Plaintiff reported and determined that as the result of medical treatment, Plaintiff did not have limitations that would not preclude her from working as a claims supervisor.  Defendant's findings are supportable.

For instance, Dr. Kang treated Plaintiff for her broken neck conservatively; the injury healed spontaneously.  For her "severe right shoulder pain" following her traumatic fall, Plaintiff underwent surgery to repair a tear in her right rotator cuff in October 2023 and then engaged in physical therapy to rehabilitate her right shoulder until April 2024. The records of Plaintiff's providers support her claim of disability through April 19, 2024, but do not establish that her disability continued thereafter.  Notably, at an office visit with PA Collins on April 19, 2024, Plaintiff reported that physical therapy was going very well, and her pain level was a two out of ten.  PA Collins cleared Plaintiff to begin lifting in physical therapy but advised her to avoid "heavy repetitive lifting if returning to work." (AR0355.)  Defendant's reliance on PA Collins's findings was reasonable.

23

Defendant's medical review was also not siloed as Plaintiff contends. The record unequivocally establishes that Defendant considered records generated by Plaintiff's treatment prior to April 19, 2024. As to Plaintiff's contention that Defendant's review on appeal unreasonably focused on the period from April 19, 2024, through June 11, 2024, the record reflects otherwise. For example, in her reviews of Plaintiff's claim, Nurse Bohnsack considered Plaintiff's complaints of and treatment for left elbow pain, Plaintiff's presentation to Dr. Kang in June 2024 with a one-month history of neck pain and headaches, an MRI of Plaintiff's left shoulder in October 2024, which revealed supraspinous tendinopathy, a chronic superior labral tear, and mild acromioclavicular joint osteoarthritis, and that Plaintiff was scheduled for a second surgery on her right shoulder following a consultation on October 22. (AR0066, AR0068.) After evaluating the records, Nurse Bohnsack found they did not support lack of work function from April-May 2024, but the records would support reopening the claim from June 11, 2024 until September 11, 2024, accommodating Plaintiff's spinal fusion surgery and three months for recovery. (AR0066.) Dr. Anand similarly considered the medical records of Plaintiff's treatment before April 19, 2024, and after June 11, 2024. (ARO725-0726.)

To the extent that Defendant's final denial letter focused in part on April 19, 2024, to June 11, 2024, Defendant's approach was reasonable. Because Defendant had determined that Plaintiff was disabled through April 19, 2024, and because Plaintiff cited her treatment for neck pain in June 2024 in support of her disability claim, which treatment began with an appointment with Dr. Kang on June 11, 2024, and included a surgery that resulted in Plaintiff's inability to work for weeks following the surgery, a central question

24

on appeal was whether she was disabled continuously from April 19, 2024, to the commencement of her treatment with Dr. Kang on June 11, 2024. Given the termination of Plaintiff's position with TRISTAR on March 15, 2024, and the ensuing termination of her eligibility for coverage under the Policy at the end of March 2024, whether the disability continued from April 19, 2024, to June 11, 2024, was an important issue on appeal. Logically, therefore, on appeal, Defendant would comment more extensively on the period of time in dispute (April 19, 2024 through June 11, 2024).

In short, Defendant did not impermissibly focus solely on the time period from April 19, 2024, to June 11, 2024, and Defendant's determination that Plaintiff was not disabled between April 19, 2024, and June 11, 2024, is supported by substantial evidence and, therefore, was not arbitrary and capricious.

## III.    Vocational Assessment

As part of Plaintiff's challenge to Defendant's determination that her total disability ended on April 19, 2024, Plaintiff contends that there was insufficient evidence to support a finding that Plaintiff could perform the physical requirements of her Regular Occupation of a claims supervisor. In support of her argument, Plaintiff cites Dr. Anand's finding that she could not push or pull with her right arm, which Plaintiff contends is a necessary requirement for a sedentary level job. Plaintiff also challenges the vocational assessments by Ms. Icardi, characterizing them as inconsistent. (Plaintiff's Opposition to Defendant's Motion at 6-8.)

In the analysis of Plaintiff's claim, medical evidence "is only part of the equation." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 381 (1st Cir. 2015). A "reasoned

25

determination of the existence of disability vel non requires, inter alia, a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy." *Id.* at 380.

Defendant conducted such an assessment. Defendant obtained a vocational opinion from Ms. Icardi, who considered the duties of a claims supervisor, the physical demands of the occupation as performed in the national economy, and whether those demands aligned with Plaintiff's limitations. (AR0076-AR0077.) Ms. Icardi noted that the physical demands of Plaintiff's Regular Occupation were sedentary-level and included occasional pushing and pulling, but mostly involved sitting, talking, and hearing. (AR0076.) She also noted Dr. Anand's opinion that Plaintiff could not use her right arm for pushing or pulling at all—but could use her left arm for pushing and pulling continuously. (*Id.*) Ms. Icardi opined that Plaintiff's restrictions "recommended by [Dr.] Anand align with the physical demands of [Plaintiff's] occupation of Supervisor, Claims, as performed in the national economy," and explained that the occupation "does not typically involve pushing or pulling activities." (*Id.*) "Therefore, based upon the recommended restrictions," Ms. Icardi concluded, Plaintiff "would not be precluded from the ability to perform the material duties of her Regular Occupation." (*Id.*)

While there is arguably some tension between Ms. Icardi's description of the physical requirements of Plaintiff's Regular Occupation as performed in the national economy—which include occasional pushing and pulling—and Ms. Icardi's conclusion that Plaintiff's occupation "does not typically involve pushing or pulling activities" (*id.*), Ms. Icardi's opinions and Defendant's decision are supportable.

26

As defined in the Dictionary of Occupational Titles, sedentary work involves exerting up to ten pounds of force occasionally—i.e., up to one third of the time—or a negligible amount of force frequently in order to lift, carry, push, pull, or otherwise move objects including the human body. *See Brigham v. Sun Life of Canada*, 317 F.3d 72, 78 (1st Cir. 2003) (referencing definition of sedentary work provided by Dictionary of Occupational Titles). Ms. Icardi's conclusion that Plaintiff's occupation does not "ordinarily" involve meaningful pushing or pulling activities is consistent with a claims supervisor's responsibilities as described by the Department of Labor, which description Ms. Icardi cited in her report.[7] Her conclusion is also consistent with the concept that a claims supervisor might be called upon to engage in those activities occasionally. Moreover, Dr. Anand, upon whom Plaintiff relies, in part, to support her challenge to Defendant's vocational analysis, concluded that Plaintiff was "quite capable of working with restrictions and limitations from 04/19/2024 and ongoing," and that "[s]he was capable of doing Sedentary level work." (ARO737.) In any event, the relevant inquiry is

---

[7] Ms. Icardi wrote:

> According to the Department of Labor, a Supervisor, Claims, supervises and coordinates activities of workers engaged in examining insurance claims for payment in claims division of insurance company:
> **Tasks**
> Analyzes and approves insurance and matured endowment claims.
> Conducts personal interviews with policy owners and beneficiaries to explain procedure for filing claims.
> Submits statement of liabilities to actuarial department for review.
> Informs departmental supervisors on claims status.
> Evaluates job performance of subordinates.
> Performs duties described under SUPERVISOR (clerical) Master Title.

(AR074.)

whether there was substantial evidence that Plaintiff could perform the material duties of a claims supervisor, as that job is performed in the national economy, not whether she could perform all aspects of a sedentary-level occupation.  *See McDonough*, 783 F.3d at 380 (concluding that insurer failed to make reasoned determination of disability under "own occupation" standard defined by reference to occupation as "normally performed in the national economy" where insurer made passing references to insured's sedentary-level occupation without attempting to articulate the material duties of insured's occupation as ordinarily performed in the national economy); *see also Bernitz*, 149 F.4th at 125 (indicating that a plan's definition of disability "and the job tasks identified by the vocational assessment do not comprise a hyper-technical rubric" but are instead a "common-sense description of the daily routine" of a person in a particular occupation).

In this case, Defendant reasonably determined that Plaintiff could perform her Regular Occupation after (a) accounting for the requirements of Plaintiff's occupation as normally performed in the national economy, (b) considering the reasoned medical opinion that she could perform work with some restrictions as of April 19, 2024, and (c) assessing the only vocational expert evidence of record, which evidence provided that Plaintiff could perform her Regular Occupation as of April 19, 2024.  Given the extent of the evidence that supports Defendant's determination, Defendant's findings and determination cannot reasonably be characterized as arbitrary and capricious.

## CONCLUSION

For the reasons stated herein, Defendant's decision denying Plaintiff's claim for disability benefits after April 19, 2024, is supportable and, therefore, is not arbitrary and

capricious. Accordingly, I recommend the Court deny Plaintiff's motion for judgment on the administrative record and grant Defendant's motion for judgment on the record.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 30th day of April, 2026.

29